EDWARD PARSONS, Plenary Guardian-Appellant, *v.* ESTATE OF CATHERINE WAMBAUGH, Respondent-Appellee.

First District (1st Division)   No. 81—2974

Opinion filed November 8, 1982.

Daniel G. Lever, of Chicago, for appellant.

Joseph L. Mack, of Chicago, for appellees.

JUSTICE GOLDBERG delivered the opinion of the court:

After a complete hearing, the trial court disallowed expenditures of $5,880.75 presented in the "Second Current Account" of Edward Parsons (defendant), acting as plenary-guardian of Catherine Wam-

baugh (ward). In addition, the court assessed a surcharge of $20,100 against defendant. Defendant appeals.

The ward was found physically and mentally incapable of handling her affairs. On October 18, 1974, defendant was appointed conservator of the person and estate of the ward. The principal asset of the estate was a home which had been owned in joint tenancy by the ward and her deceased son. The ward was also the sole beneficiary of her son's estate. At the time of the son's death in 1974, the ward was living in a rehabilitation center or nursing home. She continued to live there throughout the period of this litigation. Thus the home owned by the ward had been vacant since the death of the son.

In 1976, a dispute arose between defendant and the gas company involving a bill which defendant charged was exorbitant. Defendant refused to make payment. In March of 1976, apparently without notice, the gas company disconnected the gas from the property. This resulted in frozen pipes, general flooding, and considerable damage to the property. In addition, although the record is not definite in this regard, there is testimony that the premises were damaged on three separate occasions by freezing of water in the toilet bowl. Defendant himself testified "the gas was shut off from time to time."

Defendant hired a "remodeling contractor" to repair the damaged property. This person testified he had never been licensed by the city of Chicago or any other governmental agency. From the record, it appears an attempted renovation was largely completed by January of 1977, though incidental repairs were carried on during the next two years. In defendant's "Second Current Account" he reported total expenditures to this contractor of $11,076.10 for "repair and maintenance of the realty." The property remained vacant until it was sold in July 1981 for $52,000.

On September 20, 1980, a creditor of the ward's estate petitioned the court to remove defendant as conservator. Defendant submitted his "Second Current Account" mentioned previously, and the court appointed a guardian *ad litem* for the ward. The guardian *ad litem* challenged a portion of the payments to the contractor because of alleged lack of verification and duplicated work. Also the guardian *ad litem* argued the defendant should be surcharged for allowing the property to remain vacant from 1974 through July of 1981.

A qualified appraiser testified he inspected the property on August 5, 1981. He found the condition of the interior was "poor." He estimated the fair market value of the property to be $54,520. However, he also estimated it would cost $4,000 to "cure" the then current defects of the property. The appraiser also testified the fair mar-

ket rental value of the property from 1974 to 1981, was an average of $300 a month, assuming the property to be in good condition. He estimated the rental value of the property for the period it was vacant, six years and nine months, to be $24,300.

The trial court disallowed $5,880.75 of the $11,076.10 paid by defendant to the contractor because various payments were not verified by vouchers. The court also assessed a surcharge of $20,100 against defendant for failing to rent or attempt to rent the property. This sum was computed at $300 per month commencing only from January 1, 1976, through July 31, 1981.

█ The relationship between a guardian and his ward is fiduciary as a matter of law. (See *Carey Electric Contracting, Inc. v. First National Bank* (1979), 74 Ill. App. 3d 233, 392 N.E.2d 759.) The relationship between guardian and ward is equivalent to that between a trustee and a beneficiary. (*Lewis v. Hill* (1944), 387 Ill. 542, 545, 56 N.E.2d 619; *Nonnast v. Northern Trust Co.* (1940), 374 Ill. 248, 261, 29 N.E.2d 251.) Thus, in the instant case, the defendant as guardian had the duty to manage the ward's property with the same degree of vigilance, diligence and prudence as a reasonable man would use in managing his own property. (*Reinhold v. Lingbeek* (1943), 321 Ill. App. 119, 125, 52 N.E.2d 294, *appeal denied* (1944), 385 Ill. 630.) The Supreme Court of Illinois has specifically held for years that the duty of a guardian includes the renting of the ward's property if that property would otherwise remain unused. *Clark v. Burnside* (1853), 15 Ill. 62, 64; see also *Field v. Herrick* (1881), 101 Ill. 110, 114; Condit & Liebenow, *Management of Estates of Minors and Incompetents*, 1951 U. Ill. L.F. 268, 285.

█ We believe the record contains ample evidence to support the finding of the trial court that defendant breached his fiduciary duty by failing to lease or even attempting to lease the property for more than six and a half years after he became conservator of the estate. We reject defendant's argument that the premises were unrentable and unsaleable for the entire period. First, the trial court noted, it believed the initial damage to the property was a result of oversight on the part of defendant. Second, even accepting that defendant was in no way responsible for the initial damage, we believe the length of time in which the property was being repaired to be completely unreasonable. We find it virtually impossible to believe that a reasonably prudent man would allow his potential income-producing property to remain fallow for over six years. Once the damage had been sustained, the repairs should have been completed with greater dispatch so that income could have been realized from rentals or the property

could have been sold on an advantageous basis.

■ Regarding the disallowance of the various payments for repairs, a guardian should generally apply to the court for authorization for large expenditures. (*Leon v. Leon* (1894), 56 Ill. App. 153.) "Unauthorized acts by a guardian or conservator, even if done in good faith are done at his own risk." (Condit & Liebenow, *Management of Estates of Minors and Incompetents*, 1951 U. Ill. L.F. 268, 292.) The pertinent statute provides that the court may require specific proof to verify specific payments:

> "***. The account shall state the receipts and disbursements of the representative since his last accounting and all personal estate which is on hand, and shall be accompanied by such evidence of the disbursements as the court may require. ***." Ill. Rev. Stat. 1981, ch. 110½, par. 24—11(a).

In *Nonnast*, the supreme court disallowed various payments reported by the conservator. The court held:

> "We have already held that where claims are paid by a personal representative without filing, proof or allowance, the burden is on him to justify such payment. Here, the record shows no proof whatsoever as to the validity of the sundry items of indebtedness *** detailed above." 374 Ill. 248, 269.

■ In his brief and in oral argument, the defendant urges that the trial court followed unsworn statements of opinion and recommendations by the guardian *ad litem* who presently represents the estate. We reject this contention. The record before us shows that the case was properly tried and the trial judge heard this matter with complete impartiality. Actually, the guardian *ad litem* a qualified attorney, acted properly in presenting to the trial court the theory of the case advanced in behalf of the estate.

■ The trial court observed all of the witnesses, heard their testimony and examined all the bills, receipts, and cancelled checks presented by defendant. Of the $11,076.10 reported spent by the guardian for repairs to the property, the trial court allowed $5,195.35 and disallowed $5,880.75. Clearly, the trial court examined each disputed payment and determined whether there was sufficient proof of validity. Furthermore, the determination by the trial court as to the validity of the various expenditures was based, at least in part, on its perception of the credibility of the witnesses. Even if these parties had dealt at arm's length without the fiduciary element, we would not disturb the findings of the trial court unless they were manifestly against the weight of the evidence. (*Brown v. Commercial National Bank* (1969), 42 Ill. 2d 365, 371, 247 N.E.2d 894, *cert. denied* (1969),

396 U.S. 961, 24 L. Ed. 2d 425, 90 S. Ct. 436.) Thus we are impelled to conclude the decision by the trial court is fair and proper and the judgment should be affirmed.

For these reasons, the judgment appealed from is affirmed.

Judgment affirmed.

CAMPBELL, P.J., and O'CONNOR, J., concur.